# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

LEMAR NINJA DELVON BROOKS,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Petitioner,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Case No. 3:12-cv-00998
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
HENRY STEWARD, WARDEN,⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Judge Sharp
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Respondent.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

## MEMORANDUM OPINION

Petitioner Le'Mar Ninja Delvon Brooks was convicted and sentenced by the Circuit Court for Montgomery County in Clarksville, Tennessee after a jury trial, and is presently an inmate at the Northwest Correctional Complex in Tiptonville, Tennessee. Now before the Court is his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed along with a supporting memorandum of law. (ECF Nos. 1 and 2.) The respondent has filed his answer in opposition to the petition. (ECF No. 13.)

## I.⠀⠀⠀⠀BACKGROUND and PROCEDURAL HISTORY

On March 22, 2001, the petitioner was convicted on two counts of first degree murder by a jury and sentenced to two consecutive life prison terms.[1] While his appeal was pending, the petitioner filed a petition for a writ of error *coram nobis* in the trial court. The trial court held a hearing and denied relief. The petitioner's appeal of that decision was consolidated with the direct appeal of his conviction. The Tennessee Court of Criminal Appeals affirmed both decisions on direct appeal. *State v. Brooks*, No. M2003-02304-CCA-R3-CD, 2006 WL 2738310 (Tenn. Ct. Crim. App. Sept. 26, 2006). The Tennessee Supreme Court denied Brooks's application for permission to appeal in February 2007. Brooks then filed a petition for post-conviction relief in the state court on February 1, 2008. Counsel was appointed and a hearing conducted. This petition was denied, and the Tennessee Court of Appeals affirmed this denial. *Brooks v. State*, No. M2010-02451-CCA-R3-PC, 2012 WL 112554 (Tenn. Ct. Crim. App. Jan. 11, 2012). The Tennessee Supreme Court denied permission to appeal on May 16, 2012.

Brooks filed the instant petition for a writ of habeas corpus (ECF No. 1) on September 14, 2012,

---

[1] Under Tennessee law, this means that the petitioner must serve one hundred and four years in prison before becoming eligible for parole. (*See* ECF No. 10-20, at 15:18–19.)

asserting three separate claims for relief, as follows:

>1. That the evidence was insufficient to support a guilty verdict on the two counts of premeditated murder, such that his conviction violated the petitioner's right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution;

>2. That the trial court erred in denying the petitioner's state-court petition for a writ of error *coram nobis* on the basis of newly discovered evidence, by applying an incorrect standard of review;

>3. That the petitioner's trial counsel was constitutionally ineffective.

(See ECF No. 1, at 5, 7, 8.)  In his memorandum in support of his petition, the petitioner identifies four separate ways in which his counsel was constitutionally ineffective, including that counsel allegedly (i) failed to investigate two known witnesses, or to call them to testify at trial in favor of the defense; (ii) failed to object to prejudicial remarks made by prosecutor during closing argument; (iii) failed to object to "selective and vindictive prosecution by the State," apparently regarding Troy Pruitt's testimony at trial and Michael Melanson's testimony at a hearing on the petitioner's motion for new trial; and (iv) failed to challenge the standard used by the trial court in denying the petition for writ of error *coram nobis*.  (ECF No. 2, at 20, 26, 38, 43.)

Shortly after the petition was filed, the Court conducted a preliminary examination thereof and determined that it stated colorable claims for relief.  The Court entered an order directing the respondent to answer, plead, or otherwise respond to the petition.  Rule 4, Rules Gov'g § 2254 Cases.  The respondent submitted his answer (ECF No. 13), along with a copy of the state trial and appellate record.

The petitioner has not established that he has met the criteria in § 2254(e) for the consideration of new evidence, nor does he indicate that he is in possession of new evidence.  The Court will consider the petition in light of the evidentiary record before the state court, *see Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), and will dispose of the petition as the law and justice require.  Rule 8(a), Rules Gov'g § 2254 Cases.

## II.  FINDINGS OF FACT

### A.  Evidence Presented at Trial

The facts underlying the petitioner's conviction were summarized by the Tennessee Court of

Criminal Appeals as follows:[2]

On May 29, 1999, the victims in this case, twenty-year-old Lawrence Lee Ream, Jr., and thirteen-year-old Veronica Michelle Burnley, were found shot to death in room 11 of the Oak Haven Motel in Clarksville. The following day, Samuel Vazquez and Sophia Ross, who had been in the motel room with the defendant and the victims at the time of the murders, gave separate statements to police identifying the defendant as the culprit of the crimes. Specifically, Ross stated that the group had been watching a movie when the defendant suddenly pulled a gun and shot the victims. Vazquez stated that he had fallen asleep watching the movie but was awakened by the sound of gunshots. He said that he was fleeing from the room behind Ross when he heard two more gunshots.

. . . .

### State's Proof

The State's first witness . . . was Harry Patel, who testified that he was the manager of the Oak Haven Motel, located at 1425 Fort Campbell Boulevard in Clarksville. Patel identified a motel registration card which reflected that on May 27, 1999, a "Jimmie L. Carr" registered a party of two for the nights of Thursday, May 27, and Friday, May 28, in room 11 of the motel. Patel said that when the party failed to meet the 11:00 a.m. check-out time on May 29, he went to the room, found the door ajar, saw two individuals lying on the double bed farthest from the door, and telephoned the police.

Clarksville Police Officer Leo Rowe testified that he and Officer Jason Coombs, driving separate patrol cars, simultaneously pulled into the motel parking lot at approximately 12:20 p.m. He said the door to room 11 was ajar when they arrived, and they saw two individuals lying on a bed inside the room. When they received no response to their calls, they entered the room to find dried blood on both individuals.

Anamari Rivera, the female victim's mother, testified that approximately a week before the murders she dropped thirteen-year-old Veronica at a softball field near her school with the understanding that she would return for her after the softball game. She said she was unable to find Veronica when she returned for her at 9:00 p.m. and, upon questioning one of her friends, learned that she had already left with a boy in a blue car. Rivera said the next time she saw her daughter was when she was called to identify her dead body at the morgue.

Lawrence Ream, Sr., father of the male victim, testified that he last saw his son alive approximately two weeks before the murder. He stated that on May 29, 1999, the police called him to the morgue to identify his son's body.

Detective Timothy Saunders of the Clarksville Police Department testified he was responsible for transporting to the evidence room the two lead projectiles that police officers discovered in the motel room, two projectiles recovered from the female victim's body, and the fragment of a projectile recovered from the male victim's body. On cross-examination, he stated that he had no idea if any DNA analysis was conducted on blood

---

[2] State appellate court findings of fact can constitute factual findings in a habeas action. *See, e.g.*, *Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

samples he collected from sites outside room 11, including small blood spots on the sidewalk in front of room 15 and on the doors to rooms 15 and 16.

Detective Scott Cutler of the Clarksville Police Department described the evidence he collected from the motel room, which included the following items: three small bags of marijuana, a box of sandwich bags, a Swisher Sweet cigar box, and a Swisher Sweet cigar from the nightstand; a large bag of marijuana from the dresser; two rolls of cash totaling $159 and a set of swing scales from a backpack in the dresser; and fingerprints from the door jamb. He stated that he also dusted the door of the room for fingerprints but was unable to obtain any prints from that surface. On cross-examination, he acknowledged many items were in the room, including beverage containers and cigarette butts, that he did not dust for fingerprints. He also said that he did not know if DNA analysis was conducted on the blood samples collected from the sidewalk outside the motel.

Detective Samuel Knolton of the Clarksville Police Department testified that he recovered a lead projectile from the floor beneath the victims' bed and another lead projectile from within the bed's box springs. He identified crime scene diagrams he had prepared of the scene and stated, among other things, that the distance between the victims' bed and the wall measured twenty-one inches. On cross-examination, he acknowledged that the actual maneuverable distance between the wall and the bed was only thirteen to fifteen inches due to a heating or air conditioning unit that protruded six to eight inches into the room.

Samuel Vazquez testified that he was still in high school in 1999 and by the time of trial had known the defendant for approximately seven years. He said the defendant came by his house at 1:30 or 2:00 p.m. on May 28, 1999, driving his cream-colored Isuzu Trooper, borrowed Vazquez's cream-colored, zippered shirt, and left. Upon request, Vazquez identified the shirt he had loaned to the defendant, which was marked as Exhibit 35 and admitted into evidence. He said the defendant was still wearing the shirt at 7:00 or 8:00 p.m. when he met him at a local McDonald's restaurant. He stated that he and the defendant left the McDonald's together in the defendant's vehicle, drove around together smoking marijuana, and then went to "Showboat," where they played video games and pool until midnight when the establishment closed. They then picked Ross up at the home of her friend, Monique, and Ross smoked the last of the defendant's marijuana with them as they drove to the Oak Haven Motel to see "Mike Larry," the name by which they knew Ream, Jr. In vague and confusing testimony, Vazquez suggested that Ross, whom they had seen at Showboat earlier in the evening, had prearranged for the defendant to take her to buy marijuana from Ream to bring home to Monique.

Vazquez testified that he had known Ream since high school and was somewhat aware of his reputation as a drug dealer but did not know where to find him. He said he asked the defendant to drop him off at his home because he had been smoking marijuana all day and was tired, but the defendant instead turned into the Oak Haven Motel and pulled in front of room 11. He stated that they arrived at Ream's motel room at 12:30 or 1:00 a.m. and were admitted by Ream, who had a young girl in the room with him. He said that the group talked for a while, with Ross sitting at the head of a double bed, the defendant on a chair by the bathroom, and Vazquez on the foot of Ross's bed. At some point, Ream took a gallon-sized plastic bag half-filled with marijuana out of the night stand and rolled a "blunt," or marijuana cigarette, which everyone but the young girl smoked. Vazquez estimated that the bag contained a little over a quarter pound of marijuana and said that a quarter pound of marijuana was worth $300 to $400.

Vazquez testified that he lay down across the foot of the bed and dozed off while the group was watching the movie "Aliens." He said that he awoke at one point to find Ream and the defendant gone, that he asked the young girl where they were, and that

Ross answered that they were in the bathroom. When he checked, he saw one of the men sitting on the toilet while the two men talked. Vazquez testified he had no idea what they were talking about, but neither man appeared to be angry. He said he returned to bed and fell asleep again but was later reawakened by the sound of two gunshots. The room was filled with smoke and he noticed that it was 4:11 a.m. and the same movie was still playing on the television. He said he saw a figure dressed in black standing with an outstretched arm at the foot of the victims' bed, heard the young girl moaning, and saw Ross jump over her bed and run out the motel room door. He testified that he heard two more gunshots as he ran out the door behind Ross. He stated that he never saw the shooter's face but thought he saw him holding a handgun.

Vazquez testified that he was behind the motel a few minutes after the shooting, with Ross right in front of him, when he saw the defendant run to his vehicle, now parked behind the motel. He said that the defendant was wearing a white, tank-top style undershirt instead of the cream-colored, zippered shirt he had been wearing earlier in the evening. Vazquez stated that the defendant called for him to come on, and that, after hesitating a few seconds, he complied. He said he got into the backseat and thought that Ross was already in the front passenger seat when he got into the vehicle. As he was climbing in, or soon thereafter, he asked the defendant, "[A]re they dead?" and the defendant turned around, looked at him, and said, "[T]hey got to be, I shot them both in the head." Vazquez testified that the defendant drove to Vazquez's house, instructed him to get out, and then drove a little further before instructing or perhaps shoving Ross out of the vehicle as well. Vazquez said he did not remember seeing the defendant with a gun.

Vazquez testified that he was "high" at the time and frightened by what had just occurred. He stated that he and Ross stood together outside his house for a few minutes asking each other what had just happened before going inside, where they discussed the incident further. He testified that he drove Ross home thirty or forty minutes later, just as the sun was beginning to rise, and then returned home and tried to sleep. Approximately five or six hours after that, he drove a friend back to her school in Cookeville and was still in Cookeville when he gave a statement by telephone to Detective Miller of the Clarksville Police Department.

On cross-examination, Vazquez testified that the defendant, still dressed in his cream-colored shirt, was sitting in the chair by the bathroom when he fell asleep and that the chair was empty when he was awakened by the gunshots. He thought he might have seen the defendant carrying the shirt in his hand as he ran to his vehicle after the shooting. He testified he did not see the man in black come into the motel room and could not recall saying that he did. He also could not recall having ever said that he and the defendant searched for Ross in the defendant's vehicle or that, when they found her, the defendant held a gun on him and threatened to shoot if Ross did not get into the vehicle. He acknowledged that in his first statement to police, made approximately twelve hours after the shooting, he failed to mention that the defendant told him that he had shot both victims in the head. Vazquez explained the numerous inconsistencies in his testimony and his apparent inability to remember details of the incident by stating that he had smoked ten or eleven blunts by the time of the shooting. He denied that he had killed or robbed the victims or that he had gone to the motel room with the intention of robbing them. Finally, he acknowledged that he was currently on probation for possession of marijuana.

Dr. Bruce Levy, the medical examiner who performed the autopsy of the victims' bodies, testified that Burnley received one gunshot wound to the back of her head in which the bullet struck her brain stem, causing instantaneous death, and a second gunshot wound to the back of her right shoulder in which the bullet struck her spinal cord. He said that the gunshot wound to Burnley's spinal cord would have resulted in paralysis below the level of the injury. He testified that Ream received two gunshot wounds, either

of which would have resulted in his death: a gunshot wound to the top left side of his head, in which the bullet perforated his brain and exited from the left side of his head, and a second gunshot wound to his chest, in which the bullet perforated his heart and left lung before exiting through his back. Dr. Levy said that he was unable to tell the distance at which the gunshots to the victims' heads had been fired but was able to determine that the shots to their bodies were each fired from a distance of six inches or less. He opined that, based on his findings, the shooter had to have been standing somewhere near the middle of the side of the bed when the shots were fired.

Tennessee Bureau of Investigation ("TBI") Agent Steve Scott, an expert in the field of firearms identification, testified that the four lead projectiles recovered in the case were .38 or .357 caliber bullets which had been fired from the same gun.

Sophia Ross testified that she was a graduating high school senior in May 1999 and was acquainted with Vazquez, the defendant, and Ream. She said she saw the defendant at Showboat on the evening of May 28, 1999, but made no arrangements for him to meet her later in the evening. Later that night, however, she was visiting with Monique, Monique's brothers, and some other friends when the defendant and Ream [sic] showed up at Monique's house in the defendant's white jeep. Ross testified that when someone in the group suggested that they get some marijuana, she collected approximately $40 from her friends and left with the defendant and Vazquez to find "Mike Larry" [Ream] at the Oak Haven Motel. She said she was unaware of Ream's reputation as a drug dealer, but the defendant knew that he sold marijuana and that he was staying at the motel.

Ross testified that a girl she did not know was inside Ream's motel room with him when she, Vazquez, and the defendant arrived. She said she gave Ream $40 and he gave her some marijuana, which they rolled into blunts and smoked while they talked and watched "Alien" movies on television. She said she was leaning against the headboard of the double bed closest to the door, Vazquez was lying across the foot of her bed facing the television, and the victims were lying together on the second double bed when she saw the defendant rise from the chair in the corner where he had been sitting, walk alongside the victims' bed, and start shooting at Ream.

Ross testified that the defendant was standing about halfway along the side of the victims' bed. She thought she heard only one gunshot before she fled from the motel room and recalled that she heard another shot as she started across Highway 41-A. She said she looked back during her flight to see Vazquez running across the highway with her. She stated that she crossed the highway, ran through the parking lot of a Walgreens on the corner and started down West Concord Street in the direction of Monique's house. At about that time, however, she saw that the defendant was slowly driving his vehicle down the street. She said that she and Vazquez both tried to hide from the defendant in a clump of woods near an apartment complex, but he spotted them, pointed his gun at them, and threatened to kill them if they did not get in his vehicle. She stated that the defendant was wearing the same shirt he had worn throughout the evening, which was a white polo shirt without a zipper.

Ross testified that she got into the back of the defendant's vehicle while Vazquez got into the front. She said the defendant, who kept his gun pointed at them, repeatedly told them as he drove that he should kill them both right then. She stated the defendant took them to Vazquez's house, forced them out of the vehicle at gunpoint, threatened to kill them if they reported what had just transpired, and left. She said that Vazquez then drove her back to Monique's house, where she immediately awakened Monique and her mother to tell them what had happened. As she recalled, the sun was beginning to rise as Vazquez drove her home.

Ross testified that both Monique and her mother wanted her to telephone the police, but she was too frightened to do so. She believed, however, that Monique's mother later contacted the police. According to Ross, she had, before the shooting, been planning a Memorial Day weekend visit with her father in Flint, Michigan. She said when she learned that the bus ticket her father sent had arrived, she left that same afternoon for Michigan. Ross explained that she was very frightened of the defendant and wanted to get out of town. She said she was in Michigan when she gave a telephone interview with Detective Miller of the Clarksville Police Department.

On cross-examination, Ross testified she did not remember the defendant and Ream going to the bathroom together before the shooting or Vazquez waking and asking her where the men were. She said she and Vazquez fled from the front of the motel across Highway 41-A and did not run behind the motel. She stated that she exaggerated when she told the police in her statement that she had run all the way home to Monique's house, explaining that she was still shaken from her experiences at the time she made the statement. She said she did not know anything about guns and therefore could only describe the defendant's weapon as a little gun. She testified she never went into Vazquez's home and spent only a few minutes discussing the shooting with him before he drove her home. She estimated that it was about 5:00 a.m. when she reached Monique's home and reiterated that she had awakened Monique and her mother immediately upon her arrival at their home.

Detective Robert Miller of the Clarksville Police Department testified that he obtained a search warrant for the defendant's home and vehicle as part of his investigation of the murders. He identified Exhibit 35 as an off-white, short-sleeved shirt with a zipper and collar, which he found in the defendant's vehicle. Detective Miller testified that he did not request DNA analysis of the blood swabs collected outside rooms 15 and 16 of the motel because the information he obtained from his investigation indicated that they were unconnected to the crime scene. He conceded he did not submit Exhibit 35 for any kind of analysis, despite the fact that there were several stains visible on the shirt. He said he interviewed both Sophia Ross and Sam Vazquez over the telephone on May 30, 1999.

On cross-examination, Detective Miller acknowledged there was no physical evidence linking the defendant to the crime; he did not find the defendant's blood, fingerprints, or hair at the crime scene or the victims' blood in the defendant's home or vehicle. He further acknowledged that he never found the murder weapon. He confirmed that he spoke with a number of witnesses during his investigation of the case, including Monique Harrison, who told him that it was 11:00 a.m. or 12:00 p.m. on May 29, 1999, when Ross told her about the shooting, and not at daybreak as Ross indicated in her trial testimony. Detective Miller said that he learned from the National Weather Service that daybreak in Nashville was at 5:32 a.m. on May 29, 1999. He acknowledged that there were a number of inconsistencies between Ross's trial testimony and the original statement she gave him about the shooting. Ross, for example, told him in her statement that she had run all the way home. Furthermore, she never said anything in her statement about Vazquez running across the highway with her as she fled from the scene. Finally, Detective Miller testified that the defendant turned himself into the Berry Hill Police in Nashville on June 2, 1999, after the search warrants had already been executed on his home and vehicle.

By stipulation of the parties, the TBI laboratory reports on the evidence submitted to the lab for analysis were admitted as exhibits to the trial. Among other things, they reflected that the green plant material found in the motel room consisted of 2.6 and 4.7 grams, respectively, of marijuana.

**Defendant's Proof**

Troy Pruitt, who said he was currently in prison serving a sentence for aggravated robbery, testified that he was driving home from work at approximately 3:00 a.m. on the morning of May 29, 1999, when he spotted the defendant walking down Judy Lynn Drive in Clarksville. He said he stopped and asked the defendant, who was an acquaintance, if he needed a ride but the defendant refused, pointing to a nearby house and telling him that it was his destination. Pruitt estimated that the Oak Haven Motel was a five-minute drive or a forty-five-minute walk from the place he saw the defendant. On cross-examination, he acknowledged that he never approached the police with the above information.

Geremie Richard Ebert testified that, in May 1999, he was sixteen years old and lived in Cadiz. He said he was babysitting Shalonda Nance's and Lisa Cunningham's respective children at Nance's home in Cadiz sometime in May 1999, when the defendant showed up at 4:00 or 4:30 a.m. wanting to know where the women were. Ebert testified that he fell asleep after the defendant arrived and that the defendant remained in the home with him until he awoke a couple of hours later, somewhere around 6:00 a.m., as the sun was beginning to rise and the women were returning home. Ebert testified that the defendant's demeanor was normal. However, upon further questioning, he said he was not sure that the defendant was the man he saw that morning. On cross-examination, Ebert was unable to recall the number of children he had babysat, their names, or their ages.

Lisa Cunningham testified that she and Shalonda Nance returned home at daybreak on May 29, 1999, to find the defendant in her home with their babysitter, Geremie Ebert. She said she thought the defendant had been waiting for some time for their return because he appeared worried about them and she overheard him asking Nance where they had been. Otherwise, the defendant's demeanor seemed normal. Cunningham estimated she and Nance returned home at approximately 5:30 a.m. She acknowledged she told Detective Miller that the defendant had told them that, should anyone ask, he had been in the home all evening. Cunningham testified that the defendant never made such a statement and that she merely told the police officers what she thought they wanted to hear. She explained that there was an odor of smoked marijuana in her home when the officers questioned her and she was afraid that she would be arrested.

Rockelle Daniels testified that she was previously employed as an investigator with the public defender's office and in that capacity interviewed both Vazquez and Ross. She said that Vazquez, who was initially reluctant to talk about the incident, essentially confirmed the details he had provided in his statement to police but then volunteered that he had seen the outside door to the motel open and the man dressed in black enter the room. Vazquez also told her that he never saw the defendant with a gun and that the defendant ran from the motel room behind him as he and Ross fled to the back of the motel. Daniels further testified that Vazquez told her that he asked the defendant if the victims were dead and the defendant replied that they were because he had shot them in the head.

Daniels testified that she had great difficulty locating Ross but was eventually able to interview her as well. She said that in her account of the incident, Ross, among other things, stated the following: that the portion of her statement to police in which she said she ran all the way home was a mistake; that she was running across the highway when she heard Vazquez call to her to stop, looked back, and saw the defendant holding a gun on Vazquez; that she tried to hide in a clump of bushes near an apartment building, but the defendant found her and threatened to kill Vazquez if she did not get in the vehicle; that the defendant then took her and Vazquez to Vazquez's house; and that it was 11:00 a.m. or 12:00 p.m. by the time she returned to Monique's house.

. . . .

### Error *Coram Nobis* Hearing

Judge Justin Saunders, who said he was currently serving a prison sentence for aggravated robbery, testified that sometime before the defendant's trial he was at a party when Ross shouted "out of the blue" that she had shot "Mike Larry" in the head. Saunders testified he did not go to the police with the information because he was engaging in illegal activity at the time. On cross-examination, he acknowledged there were many other individuals at the party who heard Ross's statement and speculated that they were too frightened to come forward. He agreed that Ross was drunk at the time she made the statement. He denied that he was a member of a gang and said that he was unaware that the defendant was a gang member or that the defendant had appeared on the television show, "Montel," saying that he was a gang member.

Officer John Skidmore, called as a witness by the State, testified that he was an intelligence agent with the Criminal Intelligence Unit of the Clarksville Police Department. He said that Saunders had told him in the past that he was a member of the gang known as "M One," or "Murder One Crips."

After reviewing the trial transcript, the trial court entered an order on October 13, 2005, denying the petition for writ of error *coram nobis.* In its oral findings of fact and conclusions of law, issued the same day, the trial court found, among other things, that Saunders' testimony was not credible and likely would not have been believed by the jury. The trial court therefore concluded that the evidence would not have changed the outcome of the trial.

*State v. Brooks*, 2006 WL 2738310, at *1–*8 (footnotes omitted).[3]

---

[3] The petitioner also filed a motion for a new trial some time in 2002, on the basis of newly discovered evidence. A hearing was conducted at which both parties offered oral argument and at which the petitioner presented the testimony of Michael Melanson. (*See* 9/27/2002 Transcript of Motion for New Trial at 30–53, ECF No. 10-19, at 31–54.) Melanson testified, in sum, that he had been acquainted with both the petitioner and the victim, Larry Ream (a/k/a Mike Larry), for about a year prior to the murders, that he learned about the homicides approximately a day after they occurred, and that he had seen the petitioner sitting on the front porch of Monique Harrison's house at around 2:30 a.m. of the morning the murders occurred, at a time when, according to Sophia Ross's testimony, the petitioner was with her and Vazquez at the Oak Haven Motel. He also testified that on another occasion, approximately two days after the murders, he was at Monique Harrison's house when he overheard Harrison on the telephone telling an unknown person that she and "Sam" had gone to the river and had thrown the gun in the river. (ECF No. 10-19, at 40.) Melanson said he later learned that Sam Vazquez had testified against the petitioner at trial. Melanson also stated that he did not voluntarily come forward with this information in time to testify at the petitioner's trial because "word went out" that anyone who "was going to stick up for Lamar [Brooks], that there was going to be problems." (ECF No. 10-19, at 41.) In an oral ruling from the bench on September 4, 2003, the trial court denied the motion for a new trial without referencing Melanson's testimony. (*See* ECF No. 10-19, at 70–73.) The trial court did not explain its refusal to consider that testimony, but the issue was never presented to or addressed by the Tennessee Court of Criminal Appeals on direct appeal. As discussed herein, post-conviction counsel raised the issue as an error by the trial court (for failure to consider Melanson's testimony in ruling on the motion for a new trial) and as an effective-assistance claim during the post-conviction hearing, and the post-conviction court addressed the matter in the order denying the motion for post-conviction relief. (*See* Order Denying Petition for Post-Conviction Relief at 32–33 and 58–62, ECF No. 10-18, at 101–02 and 127–31.) The issue was not raised on appeal (*see* Petitioner's Post-Conviction Appellate Brief, ECF No. 10-23), and the Tennessee Court of Criminal Appeals was therefore never called upon to address it.

As stated above, on the basis of this evidence, the petitioner was found guilty on two counts of first-degree premeditated murder and received two consecutive life sentences. The trial court also denied his petition for a writ of error *coram nobis*. The Tennessee Court of Criminal Appeals affirmed.

**B.        Post-Conviction Evidence**

The state appellate court summarized the evidence presented at the post-conviction hearing as follows:

> *A. Petitioner's Proof*
>
> At the hearing, the Petitioner called Montgomery County Sheriff's Deputy Erin William Kellett. Deputy Kellett testified that as part of the investigation of this case, he took a statement from James Rogers Taylor, II. The Petitioner introduced Mr. Taylor's statement at the hearing. According to the statement, the morning after the murders Mr. Taylor, Jimmie Carr, and Rod Crouch stopped by the house where Ms. Ross was staying. Mr. Taylor told Deputy Kellett that Ms. Ross asked if they could "take her to the mall so she could get some shoes." The group dropped Mr. Carr off and went to the mall and then took Ms. Ross back to the house where she was staying. The Petitioner also introduced a statement given by Mr. Carr in which he told the police that the morning after the murders the group "talked to" Ms. Ross. Deputy Kellett testified that he did not interview Mr. Carr. The detective who interviewed Mr. Carr was not called as a witness at the post-conviction hearing. Neither Mr. Taylor nor Mr. Carr testified at the post-conviction hearing.
>
> At the hearing, the Petitioner testified that he asked trial counsel to subpoena Mr. Taylor and Mr. Carr, but that trial counsel failed to call them as witnesses. The Petitioner said that he wanted Mr. Taylor to testify because his statement called into question Ms. Ross's credibility. The Petitioner reasoned that if Ms. Ross had gone to the mall as Mr. Taylor had told Deputy Kellett, then this would call into question her timeline of events the morning after the murders. The Petitioner also concluded that Mr. Taylor's statement refuted Ms. Ross's testimony that she was extremely frightened after the shootings. The Petitioner pointed out that if Ms. Ross had money to buy shoes the morning after the murders, then there was no need for her to borrow money from her friend to purchase marijuana from Mr. Ream the night before. The Petitioner concluded that Mr. Taylor's testimony would have been important because it would have shown that Ms. Ross "was lying." The Petitioner also stated that he wanted Mr. Carr to testify because he could corroborate Mr. Taylor's statement.
>
>              . . . .
>
> The Petitioner also testified that he believed trial counsel was ineffective because he failed to object strenuously enough to the State's cross-examination of Mr. Pruitt. According to the Petitioner, the State was implying that the Petitioner was a gang member when it asked Mr. Pruitt about his gang membership. The Petitioner also stated that he was prejudiced by the State's cross-examination of Mr. Pruitt because "as far as the jury is concerned, they are all like well, this guy is a gang member, he's testifying for his buddy. There's no way that we are going to believe him. . . ." The Petitioner concluded that trial counsel should have objected earlier and requested a jury-out hearing before any cross-examination regarding Mr. Pruitt's gang affiliation could occur.
>
>              . . . .
>
> The Petitioner also faulted trial counsel for not objecting to what he considered to

be several instances of prosecutorial misconduct during the State's closing argument. The Petitioner testified that he believed the prosecutor committed misconduct by (1) misstating the evidence presented at trial by theorizing that Mr. Ream had kept a gun in the motel dresser and suggesting the victims were robbed; (2) vouching for the credibility of the State's witnesses and calling the Petitioner's witnesses liars; (3) intentionally inflaming the prejudices of the jury by referring to the criminal backgrounds of some of the Petitioner's witnesses; (4) arguing issues greater than the Petitioner's guilt or innocence by urging the jury not to vent their frustrations with the poor quality of the police investigation by returning a not guilty verdict; and (5) arguing facts outside the record. The Petitioner also faulted trial counsel for not objecting "to the selective and vindictive prosecution" of a witness he presented at his motion for new trial hearing. The Petitioner contended that the State's questioning of the witness about his gang affiliation amounted to "selective and vindictive prosecution."

. . . . The Petitioner also faulted appellate counsel for failing to raise the issues of the alleged prosecutorial misconduct and the State's "selective and vindictive prosecution" on appeal. Additionally, the Petitioner alleged that appellate counsel was ineffective for failing to challenge on appeal the standard of review used by the trial court in the error *coram nobis* proceeding.

### B. State's Proof

Trial counsel testified that the Petitioner's primary defense at trial was that the Petitioner was not present and did not commit the murders. Trial counsel also attempted to emphasize that there was no forensic evidence to connect the Petitioner to the murder scene and to challenge the credibility of the State's two eyewitnesses. Trial counsel admitted that if Mr. Taylor had testified to the facts in his statement, it could have impeached Ms. Ross and "[t]hat sounds like something that would matter and I overlooked it." Trial counsel further admitted that having someone to testify about Ms. Ross's demeanor after the shooting could have been important. However, trial counsel also testified that he had reviewed Mr. Taylor's statement prior to trial, that it did not bring "anything to the proceedings in terms of alibi," and that it did not have "any useful information at all." Trial counsel also reviewed Mr. Carr's statement and did not think that it had any useful information either, although he did have his investigator attempt to contact Mr. Carr.

. . . .

Trial counsel testified that he did not object to Mr. Pruitt having been asked about his gang affiliation because "the State was not during these questions, implying [that the Petitioner] was a gang member. The State was implying that the witness [Mr.] Pruitt was a gang member." Trial counsel said that he also thought that it was better not to object because "sometimes that just calls more attention to it and it is better to let it slide." Trial counsel further hoped that the jury would consider that perhaps the murders had been gang related because there had been some evidence that Mr. Ream was a gang member. Trial counsel did admit that one reason for the State to question Mr. Pruitt about his gang affiliation would have been to imply that the Petitioner was also a gang member.

. . . .

. . . . Trial counsel was not asked about why he did not object to the alleged prosecutorial misconduct during the State's closing argument or the State's alleged "selective and vindictive prosecution" of one of the Petitioner's witnesses.

. . . . Appellate counsel also testified that he did not challenge on appeal the State's closing argument because "[i]t just didn't strike [him] as something that needed to

be raised."

        Appellate counsel testified that he felt the trial court used the wrong standard of review in denying the Petitioner's petition for writ of error *coram nobis*. However, appellate counsel testified that he did not specifically challenge the standard used by the trial court on direct appeal. Instead, appellate counsel "highlight[ed] what the standard was and revisit[ed] what the testimony was and argue[d] to [the appellate court] that the writ should have been granted."

*Brooks v. State*, 2012 WL 112554, at *5–*8.

## III.    STANDARD OF REVIEW

### A.    Procedurally Defaulted or Waived Claims

A federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once a petitioner's federal claims have been raised in the highest state court available, the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).[4]

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains

---

      [4] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). However, if an unexhausted claim would be procedurally barred under state law, for instance by statutes of limitations or state rules barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *cf. Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

### B. Fully Exhausted Federal Claims

Even when a petitioner's application for a writ of habeas corpus raises a federal constitutional claim that has been properly exhausted in the state court system, this Court's review of the state court's resolution of the issue remains quite limited. The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* In other words, a federal court is bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Franklin v. Francis*, 144 F.3d 429, 433

(6th Cir. 1998). Additionally, this Court must presume the correctness of state court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

## IV. ANALYSIS OF CLAIMS

### A. Whether the Evidence Was Insufficient to Support the Verdict

The petitioner argues that the State's proof at trial was insufficient to prove each and every element of the offense of first-degree murder, specifically because there was no "tangible" evidence of the petitioner's guilt. Instead, he was convicted solely on the basis of circumstantial evidence. (ECF No. 2, at 7.) The petitioner argues that this circumstantial evidence was insufficient to establish that he was the perpetrator of the murders, and further that no evidence of premeditation was introduced. In response, the respondent argues that, to the extent the petitioner's challenge to the sufficiency of the circumstantial evidence may be construed as a challenge to the credibility of the State's witnesses, such claim is not cognizable on habeas review, first because this theory was not presented in the state courts and is therefore defaulted, and second because the claim, which is directed toward the quality of the evidence rather than its sufficiency, does not involve an error of constitutional dimension. The respondent concedes, however, that the petitioner fully exhausted his claim regarding the sufficiency of the evidence of premeditation, but argues that the state court's resolution of the claim was consistent with federal law.

#### 1. Sufficiency of the Evidence: Circumstantial Evidence

The petitioner never argued in the state-court proceedings that the evidence used to convict him was insufficient because it consisted solely of circumstantial evidence. To preserve a federal constitutional claim for habeas corpus, the legal and factual basis of the claim must be "fairly presented" to the state courts so that they have an opportunity to remedy the alleged constitutional violation. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). To be found to have fairly presented a claim in the state courts, a petitioner must have presented his claim to the state courts "under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998).

If a habeas petitioner failed to properly raise the claim in state court, and state law no longer

allows him to raise it, the claim is procedurally defaulted. *Williams*, 460 F.3d at 806. For purposes of the case at bar, Tennessee law clearly would not allow the petitioner to seek review of any claim that is presented here for the first time. *See* Tenn. Code Ann. § 40-30-102(a) (establishing a one-year statute of limitations for the filing of a petition for post-conviction relief); *id.* § 40-30-102(c) (permitting the filing of only one post-conviction petition by state prisoners); *id.* § 40-30-117 (setting forth the very narrow grounds under which a petitioner may file a motion in the trial court to reopen his first post-conviction petition). Thus, the sufficiency-of-the-evidence claim, framed in terms of an objection to the circumstantial nature of the evidence, is technically exhausted but procedurally defaulted.

To obtain review of a claim despite its defaulted status, the petitioner "must present affirmative evidence or argument as to the precise cause" for his failure to raise the claim in the state court and the prejudice that resulted. *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citations omitted). The petitioner here has not addressed either cause or prejudice, nor has he made any attempt to claim that failure to consider the claim now will result in a fundamental miscarriage of justice. The claim is therefore not reviewable.

Regardless, even if the claim had been preserved, the Sixth Circuit has expressly recognized that "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 824 (6th Cir. 2006) (citations omitted); *see also United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) ("[P]hysical evidence is not a prerequisite to sustaining a conviction."). Moreover, the petitioner's challenge is, in reality, a challenge to the credibility of the witnesses upon whose testimony his conviction was based. A challenge based on witness credibility goes to the *quality* of the government's evidence and not to the *sufficiency* of the evidence, and as such is not cognizable on habeas review. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). Thus, even if the Court were to reach the merits of the claim, relief on the basis of this claim would not be warranted.

### 2. Sufficiency of the Evidence: Premeditation

Insofar as the petitioner's claim is addressed to the sufficiency of the evidence of premeditation, the respondent concedes that this claim was raised on direct appeal as a federal due-process claim, but argues that the state court's resolution of the issue was neither contrary to nor an unreasonable

application of clearly established federal law, and it did not involve an unreasonable determination of the facts in light of the evidence.

In considering the petitioner's sufficiency-of-the-evidence claim on direct appeal, the Tennessee Court of Criminal Appeals reasoned as follows:

> When the sufficiency of the convicting evidence is challenged on appeal, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190–92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:
>
> > This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.
>
> *Bolin v. State*, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).
>
> The defendant was convicted of two counts of first degree murder, defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). Premeditation is defined as
>
> > an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.
>
> *Id.* § 39-13-202(d).
>
> Whether premeditation exists is a question for the jury to determine based on the evidence, and it may be established by the defendant's conduct and the circumstances surrounding the killing. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Our courts have listed a number of different facts from which premeditation may be inferred, including evidence the defendant had a motive for the killing; evidence that the defendant procured a weapon; the defendant's declarations of an intent to kill; evidence the defendant made preparations to conceal the

crime before the killing; the defendant's use of a deadly weapon on an unarmed victim; the particular cruelty of the killing; evidence that the victim was retreating or attempting to flee; infliction of multiple wounds; evidence of the defendant's calmness immediately following the killing; and the defendant's destruction or secretion of evidence after the killing. *See State v. Dellinger*, 79 S.W.3d 458, 492 (Tenn.), *cert. denied*, 537 U.S. 1090 (2002); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *Bland*, 958 S.W.2d at 660; *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The defendant contends that the State failed to prove premeditation beyond a reasonable doubt and that the evidence at most supports a conviction for second degree murder. In support, he points out that there was no evidence that he threatened to kill the victims, took steps to conceal the crime or destroy evidence, or was calm after the killings. The State argues that the evidence was sufficient to sustain the jury's verdicts. We agree with the State.

When viewed in the light most favorable to the State, there was sufficient evidence to show beyond a reasonable doubt that the killings were intentional and premeditated and that the defendant was the perpetrator of the crimes. We acknowledge that Vazquez's and Ross's trial testimony differed from each other on some points and that each of them offered different and conflicting details at trial than they provided in their previous statements to police and other investigators. However, we also note that their testimony was in agreement on other key aspects of the crime, including their purpose in going to the motel room and the activities that the group engaged in before the shootings occurred. Furthermore, the jury could have easily attributed the various inconsistencies and vagueness of their accounts to the effects of the drugs they had ingested during the hours preceding the shooting. This is especially true in the case of Vazquez, who repeatedly testified that he had been smoking marijuana all day on May 28 and was "very high" by the time of the shootings. Vazquez additionally testified that he was asleep when the shootings began, which is another factor that could explain his confusing and sometimes conflicting accounts of the crime and its aftermath.

The evidence, when viewed in the light most favorable to the State, was also sufficient to establish premeditation. It was undisputed that the unarmed victims were killed by gunshots fired into their heads and torsos as they lay together in a double bed. If Ross's testimony is believed, the defendant rose and without warning or provocation walked along the side of the victims' bed to fire his gun at close range at the victims. Vazquez testified that the defendant fled after the crime and confessed to him in the vehicle that he had killed the victims by shooting them in the head, and Ross testified that the defendant threatened to kill her and Vazquez if they told anyone what he had done. The defendant's motive for the killings was suggested by Vazquez's testimony about the large amount of marijuana Ream had with him in the motel room and the evidence that there was a significantly smaller amount of marijuana in the room when the police arrived to begin their investigation. Keeping in mind that credibility determinations are within the province of the jury, we conclude that the above evidence, taken together, was sufficient for the jury to find the defendant guilty of the first degree premeditated murders of the victims.

*Brooks*, 2006 WL 2738310, at *9–*11.

The Tennessee Court of Criminal Appeals correctly cited the applicable federal standard of review from *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and reasonably decided the claim against the petitioner. The state court's resolution of the claim was not contrary to clearly established federal law, nor

did it involve an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence, slim as that evidence may have been. *See* 28 U.S.C. § 2254(d). The petitioner is therefore not entitled to relief on the basis of this claim.

**B.** **Whether the Trial Court Applied an Incorrect Standard in Reviewing the State Petition for Writ of Error *Coram Nobis***

The petitioner argues that the trial court applied the wrong standard of review in denying his petition for the writ of error *coram nobis*. He raised this claim in his direct appeal, where he asserted specifically that the trial court erroneously denied the writ based on the court's conclusion that the proposed new evidence the petitioner sought to introduce "*would not have* [led] to a different result." *See State v. Brooks*, 2006 WL 2738310, at *12 (quoting the trial court's holding). The petitioner asserts that the correct standard of review of a petition for writ of error *coram nobis* under state law is that the writ will lie "for subsequently or newly discovered evidence related to matters which were litigated at the trial if the judge determines that such evidence *may have resulted in a different judgment*, had it been presented at the trial." (Petitioner's Brief on Appeal of Denial of Writ of Error *Coram Nobis* at 10, ECF No. 10-13, at 11 (quoting Tenn. Code Ann. § 40-26-105).) In his state appellate brief, the petitioner, through counsel, noted that the decision whether to grant or deny a petition for the writ of error *coram nobis* rests within the trial court's discretion, and involves a determination of the credibility of the witnesses who testify in support of the accused person's petition. At no point did the petitioner frame the issue in terms of his federal constitutional rights. (ECF No. 10-13, at 11–18.)

The trial court denied his petition on the basis that, after weighing very carefully the credibility of the witness whose testimony the petitioner sought to introduce into evidence, the proffered testimony "would very likely not be found to be credible" and "would very likely have been discounted by the jury," and therefore that "there would not have been a different result" even if the evidence had been introduced at trial. *State v. Brooks*, 2006 WL 2738310, at *12. The Tennessee Court of Criminal Appeals affirmed on the basis that the trial court did not abuse its discretion in concluding that "the newly discovered evidence in this case, consisting of testimony by an admitted criminal with possible gang connections that Ross, while drunk at a party, shouted out that she had killed Ream, would not have changed the outcome of the trial." *Id.*

A federal habeas petitioner may obtain relief if he is "in custody pursuant to the judgment of a

State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petitioner's assertion that the trial court erred in denying the motion for writ of error *coram nobis* involves the alleged failure of the trial judge to comply with state law. As such, the claim "is not cognizable in a federal habeas corpus proceeding." *Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986). *See also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law. . . ."); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("[A] federal court may not issue the writ on the basis of a perceived error of state law."); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus.").

Insofar as the petitioner seeks now to present this claim in terms of a federal constitutional violation, the claim is unreviewable because the petitioner never presented the claim to the state courts under this theory. Further, under Tennessee law no state remedy remains available to the petitioner for seeking review of the claim as a federal claim in the state courts. *See* Tenn. Code Ann. §§ 40-30-102(a) and (c), 40-30-117. Consequently, the claim is technically exhausted but procedurally defaulted. *See Alley*, 307 F.3d at 385 (holding that if an unexhausted claim is procedurally barred under state law, the claim is procedurally defaulted for purposes of federal habeas corpus review).

To obtain review of this claim despite its defaulted status, the plaintiff must show cause for the failure to raise the claim before the state court and the prejudice that resulted. *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citations omitted). The petitioner here has shown neither cause nor prejudice, nor has he made any attempt to assert that the failure to consider the claim now will result in a "fundamental miscarriage of justice."

The petitioner is therefore not entitled to relief on the basis of this claim.

### C. Whether the Petitioner's Trial Counsel Was Constitutionally Ineffective

The petitioner claims generally that he was denied the effective assistance of counsel at trial, in violation of his rights under the Sixth Amendment. As indicated above, he sets forth four separate ineffective-assistance claims in his memorandum in support of his petition, including that counsel allegedly:

(i) failed to investigate two known witnesses, James Taylor and Jimmy Carr, or to call them to testify at trial in favor of the defense;

(ii) failed to object to prejudicial remarks made by prosecutor during closing argument;

(iii) failed to object to "selective and vindictive prosecution by the State" regarding Troy Pruitt's testimony at trial and Michael Melanson's testimony at motion for new trial; and

(iv) failed to challenge the standard used by the trial court in denying the petition for writ of error *coram nobis*.[5]

To succeed on his ineffective-assistance claims, the petitioner must first show that his "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The petitioner must then demonstrate prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Further, however, this Court's review of this case is controlled by 28 U.S.C. § 2254(d)(1), under which the writ may be granted only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law," or if the state appellate court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002).

### (i) Counsel's failure to investigate two witnesses or to call them to testify at trial

The petitioner argues that his trial counsel knew or should have known that witnesses James Taylor and Jimmy Carr, who were interviewed by police detectives on May 29, 1999, could have offered

---

[5] In an introductory paragraph in the memorandum in support of his habeas petition, the petitioner identified three other potential ineffective-assistance claims: that his trial counsel (i) opened the door to prejudicial testimony; (ii) failed to hire an investigator; and (iii) failed to fully investigate and prepare the witnesses who testified at trial. (ECF No. 2, at 18–19.) The Court concludes based on the context in which these claims are presented that they were intended generally to describe the four specifically identified claims. In the event the petitioner intended to include these as independent claims, none entitles him to relief. The first of these claims is encompassed by the petitioner's other claims (specifically, his "selective and vindictive prosecution" claim), and the other two claims are procedurally defaulted because they were not presented under any rendition or theory to the trial courts (except insofar as they might have been incorporated into other arguments). Moreover, the petitioner did not provide any facts or argument in support of these claims in his petition or memorandum. These subclaims, if they were intended to be raised as claims at all, are therefore subject to dismissal on the basis that they are procedurally defaulted, and because they do not comply with Rule 2(c) of the Rules Governing § 2254 Cases, which requires that a habeas petition must "specify all grounds for relief available to the petitioner" and "state the facts supporting each ground."

testimony that could have shed light on Sophia Ross's demeanor the day following the murders, called into question her truthfulness, and implicated her as a suspect. This claim is fully exhausted.

The petitioner first raised this claim in his post-conviction proceedings. At the time of the post-conviction hearing, however, eleven years had passed since the murders, and approximately nine years since the trial. Post-conviction counsel stated in open court that he did not subpoena James Taylor and Jimmy Carr because he was unable to locate them. (Post-Conviction Hearing Transcript at 20, ECF No. 10-20, at 21.) The attorney nonetheless introduced into evidence (over the State's objection) the typed reports of interviews these individuals gave to police officers the day after the murders. According to these records, Taylor told police that, the morning after the murders, he and two friends, "Rod" and "Jimmy" (Carr), went to the house where Sophia Ross was staying, and she asked for a ride to the mall so she could buy some shoes. Taylor and his friends agreed. They dropped Carr off on the way to the mall, took Sophia to the mall, and later took her back to the house from which they had picked her up. (ECF No. 10-22, at 5.) Jimmy Carr's statement, taken by a different police officer, did not precisely corroborate Taylor's but he did indicate that he and Taylor and another individual named Rod had gone to Monique's house that morning, where they talked to a girl named Sophia. (ECF No. 10-22, at 10.)

When questioned about the statements given to the police by these witnesses, the petitioner's trial counsel agreed with post-conviction counsel that, because the State's evidence in the case was very weak, that "every little bit of . . . exculpatory evidence, every tiny little bit would be useful" (ECF No. 10-20, at 94), and testified that "[a]ny testimony that would impeach the credibility of those two eyewitnesses [Vazquez and Ross] would be helpful." (*Id.*) Specifically regarding Taylor's statement that Ross went out to the mall to buy shoes, the attorney was asked whether this information would have been important to impeach Ross's testimony that she had borrowed money from other persons to buy marijuana and had given all her money to Ream, the attorney replied, "That sounds like something that would matter and I overlooked it." (ECF No. 10-20, at 96.) The attorney could not recall whether he sent his investigator to speak to Taylor, but acknowledged that if he had, the investigator would have provided him with notes, and there were no such notes in his files.

The post-conviction court recognized that the statements from Taylor and Carr that the petitioner sought to offer into evidence were hearsay, but took into consideration the fact that post-conviction

counsel had made a "diligent good faith effort to locate Mr. Taylor and was unable to do so," and therefore considered the statements anyway. The court presumed that if Taylor and Carr had testified at trial consistently with their pretrial statements to police, their testimony "could have impeached Ms. Ross's testimony." (ECF No. 10-18, at 108.) However, the court also noted that there was no other evidence in the record from which the court "could assess the veracity of the statements or the potential credibility of Mr. Taylor or Mr. Carr as witnesses," and that without such evidence, the petitioner could not establish that his trial counsel rendered ineffective assistance. (*Id.*) The Tennessee Court of Criminal Appeals affirmed, noting that it had "long held that '[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.'" *Brooks v. State*, 2012 WL 112554, at *11 (quoting *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Ct. Crim. App. 1990)). Without such live testimony, the court held, there is "[no] way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. . . . We cannot speculate as to what a witness may have said if presented or how the witness may have responded to a rigorous cross-examination." *Id.* (internal quotation marks and citations omitted).

The Sixth Circuit has affirmed the denial of habeas relief on the basis of a very similar claim. In *Stewart v. Wolfenbarger*, 468 F.3d 338 (6th Cir. 2006), the petitioner argued in his state post-conviction proceedings that his trial counsel had been ineffective for failing to call a certain witness to testify at trial. However, the same witness, though subpoenaed, also did not testify at the post-conviction hearing. Counsel offered the affidavit of the witness instead, but the post-conviction hearing court declined to consider it on the basis that it was inadmissible hearsay. On appeal, the state appellate court noted that there was "no way of knowing what [the witness's] testimony might have been since he did not appear for the hearing," and therefore found that the petitioner had "failed to meet his burden of demonstrating ineffective assistance of counsel." *Id.* at 353. The petitioner raised the same argument in his § 2254 proceeding. The Sixth Circuit held that "[t]he decisions of the state trial court and state court of appeals on this point were not contrary to or an unreasonable application of clearly established federal law." *Id.* (citing 28 U.S.C. § 2254(d)(1)). The court further noted that the petitioner "point[ed] to no Supreme Court

decision that holds that a state court must consider inadmissible hearsay evidence when deciding a claim of ineffective assistance of counsel," *id.*, and therefore held that the petitioner was not entitled to relief on the basis of this ineffective-assistance claim.[6]

That conclusion governs the outcome in this case as well. This Court has little difficulty in concluding that trial counsel's performance was deficient insofar as he failed to make any attempt to interview Taylor or Carr or to call them to testify at trial, despite the potential of their testimony to discredit Sophia Ross. Notwithstanding, speculation aside, this Court is bound by the inescapable fact that, without the testimony of the absent witnesses, the petitioner has no way to prove that he was prejudiced by their absence. More importantly, for purposes of federal habeas review, this Court cannot find that the state courts' denial of relief on that basis was contrary to clearly established federal law, or that it involved an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence. The petitioner's claim of ineffective assistance of counsel based on his trial counsel's failure to call Taylor or Carr to testify therefore fails.

### *(ii) Counsel's failure to object to prejudicial remarks made by the prosecutor during closing argument*

The petitioner argues, and argued in his appeal of the trial court's denial of post-conviction relief, that the State's case was very weak, and boiled down to nothing more than the inconsistent testimony of Sophia Ross and Sam Vazquez. The petitioner presented two alibi witnesses, and, according to the petitioner, the State prosecutor called them liars during his closing argument. (Transcript, Closing Argument, at 104:24–105:3, ECF No. 10-6, at 106–07 ("Are Mr. Brooks' witnesses being truthful that he was in Cadiz, or walking down Judy Lynn? The answer to that question is no. They cannot be truthful.").) The petitioner argued that this statement and others, in light of the weakness of the State's case, constituted prosecutorial misconduct and prejudiced the defendant. The petitioner contends that his counsel's failure to object to that and other comments the petitioner testified about in the post-conviction hearing constitutes ineffective assistance of counsel.

The state post-conviction court itself acknowledged that "certain portions of the closing argument may have been inappropriate," but rejected the petitioner's argument on the basis of state law, because

---

[6] The court actually reversed the district court's decision and granted the habeas petition, but on different grounds.

the "argument was not composed entirely of inappropriate statements intended solely to inflame the jury's passions." (Order Denying Post-Conviction Relief at 55, ECF No. 10-18, at 124.) The court also noted that trial counsel had not been asked at the evidentiary hearing why he failed to object during the closing argument so the court "could only speculate as to why [the attorney] did not object." (Order at 56, ECF No. 10-18, at 125.) A review of the record confirms that the petitioner's trial counsel was not asked about why he failed to object during the prosecutor's closing argument. Appellate counsel testified that he did not address the State's closing argument on appeal because he did not believe the issue warranted attention.

The State argued to the Tennessee appellate court that the petitioner failed to prove ineffective assistance as to this issue because trial counsel was not questioned about it during the post-conviction hearing. The Tennessee Court of Criminal Appeals, having already cited to the *Strickland* standard, resolved the issue as follows:

> This court has previously considered whether the failure to object during a closing argument is generally sufficient for a showing of ineffective assistance of counsel. The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions. Trial counsel could decide not to object for several valid tactical reasons, including not wanting to emphasize unfavorable evidence. Because of this, testimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective. This court has previously held that without testimony from trial counsel or some evidence indicating that his decision was not a tactical one, we cannot determine that trial counsel provided anything other than effective assistance of counsel. The Petitioner did not present any evidence at the post-conviction hearing to suggest that trial counsel's failure object to the prosecutor's remarks was anything other than a tactical decision. Furthermore, trial counsel was not asked at the hearing about why he did not object to the prosecutor's remarks. Accordingly, we must conclude that trial counsel provided effective assistance of counsel in this regard.

*Brooks*, 2012 WL 112554, at *14 (internal quotation marks and citations omitted).

The state court's determination that the petitioner failed to carry his burden of establishing that his counsel was ineffective was not unreasonable. Under *Strickland*, a showing of deficiency requires "showing that counsel made errors so egregious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 466 U.S at 687. In addition, reviewing courts must indulge a "strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington v. Richter*, --- U.S.----, 131 S. Ct. 770, 790 (2011) (internal quotation marks and citation omitted). The Supreme Court has recently reiterated the long-

standing principle that judicial scrutiny of counsel's performance must be highly deferential, and courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Knowles v. Mirzayance*, --- U.S.----, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 689). In addition, the Sixth Circuit has recognized that "not drawing attention to [a] statement may be perfectly sound from a tactical standpoint." *United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006). Thus, in other words, the state court's rejection of this claim on the basis that counsel was not questioned at the hearing as to why he did not object during closing argument was not unreasonable or contrary to clearly established federal law. The petitioner is not entitled to relief on the basis of this claim.

### (iii) Counsel's failure to object to "selective and vindictive prosecution by the State"

The petitioner asserts that his trial counsel "failed to object to 'the selective and vindictive prosecution by the State' regarding Troy Pruitt's testimony at trial and Michael Melanson's testimony at Motion for New Trial." (ECF No. 2, at 39.) The Court construes this claim as premised upon the petitioner's dissatisfaction with his trial counsel's failure to object more strenuously to the State's questioning of his witnesses regarding their gang affiliation. Specifically with respect to the State's questioning of Troy Pruitt, the petitioner's counsel actually did object but was overruled, until the trial court *sua sponte* halted the proceedings and questioned the attorneys outside the jury's hearing. During that bench conference, the prosecutor admitted that he did not have a good-faith basis for believing that the petitioner was or had ever been a gang member. The court found that his line of questions to Pruitt suggested that the petitioner was affiliated with a gang, and therefore directed the prosecutor to cease that line of questioning. (March 21, 2001 Trial Transcript (Vol. I of II) at 129–30, 135–38, ECF No. 10-4, at 130–31,136–39.) The petitioner nonetheless contends that the State unfairly portrayed Pruitt as a gang member and therefore as untrustworthy, and likewise posed similar questions to Michael Melanson that were designed to attack his creditworthiness on the basis that he was affiliated with a gang.

Specifically with respect to the questioning of Michael Melanson, the Court finds that the claim is defaulted. The petitioner listed the "selective and vindictive prosecution" claim as a ground for relief in his amended petition for post-conviction relief in the state court (ECF No. 10-18, at 48), and connected the argument to Troy Pruitt, but not to Michael Melanson, in the memorandum of law in support of the

amended petition. (Post-Conviction Memorandum, ECF No. 10-18, at 56–60.) At the post-conviction hearing, the petitioner focused on the State's cross-examination of the petitioner's alibi witness, Tony Pruitt (ECF No. 10-18, at 56–60), but also testified that he believed his trial counsel was ineffective for failing to object to the "selective and vindictive prosecution" of Michael Melanson, who testified in connection with the petitioner's motion for a new trial. (PC Hr'g Tr. at 63, ECF No. 10-20, at 64.) The petitioner asserted that his attorney should have objected to the prosecutor's questioning of Melanson about his gang affiliation after the court had already ruled that such testimony could not be presented at trial. The petitioner's trial attorney was asked about why he failed to object to the questioning of Pruitt, but was not asked about why he failed to object during the cross-examination of Melanson. The issue as it related to Melanson was not raised on appeal (see Petitioner's Post-Conviction Appellate Brief, ECF No. 10-23), and the Tennessee Court of Criminal Appeals was therefore never called upon to address it.

In short, the claim as it pertains to Melanson is unreviewable now because the petitioner never presented it to the state appellate court. Further, under Tennessee law no state remedy remains available to the petitioner for seeking further review of this claim in the state courts. *See* Tenn. Code Ann. §§ 40-30-102(a), 40-30-102(c), 40-30-117. Consequently, the claim is technically exhausted but procedurally defaulted. *See Alley*, 307 F.3d at 385 (holding that if an unexhausted claim is procedurally barred under state law, the claim is procedurally defaulted for purposes of federal habeas corpus review). The petitioner has failed to show the cause or prejudice required to obtain review of the claim despite its defaulted status. The petitioner is therefore not entitled to relief on the basis of this claim.

With respect to the witness Troy Pruitt, trial counsel testified that he did not object to the State's questioning of Pruitt regarding his gang affiliation because the questioning did not imply that the petitioner himself was a gang member. The attorney also testified that he was hesitant to object because (1) he did not want to call too much attention to the gang issue; and (2) he felt that if the testimony implied that Ream, the murder victim, was a gang member, that actually helped the petitioner's case.

The trial court denied relief on the basis that the petitioner had not shown that he was prejudiced by his counsel's failure to object to the testimony or to request a hearing outside the presence of the jury. The petitioner's counsel presented the issue as it related to Pruitt in the post-conviction appeal. In addressing it, the Tennessee Court of Criminal Appeals stated in relevant part as follows:

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368–72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. . . . .

The petitioner contends that trial counsel was ineffective for failing to request a juryout [sic] hearing regarding the State's "gang related questioning" of Mr. Pruitt on crossexamination. . . .

Tennessee Rule of Evidence 404(b) provides that evidence of other wrongs or bad acts is "not admissible to prove the character of a person in order to show action in conformity with the character trait." However, Rule 404(b) only applies to acts which reflect upon the character of the criminal accused. *See State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002). Mr. Pruitt was never asked if the Petitioner was a member of a gang. Mr. Pruitt was asked if the tenants of gang membership or prison life required him not to testify against "people charged with crimes." The questions focused on Mr. Pruitt's gang affiliation and whether that created some sort of bias on the Defendant's behalf. Rule 404(b) was not applicable because the acts at issue reflected upon the character of Mr. Pruitt and not the character of the Petitioner. Accordingly, trial counsel could not have been ineffective for failing to raise a Rule 404(b) objection when Rule 404(b) did not apply in the first place.

Tennessee Rule of Evidence 608(b) governs the impeachment of a witness for prior bad acts and specifically provides for a jury-out hearing "upon request." However, the State was not seeking to introduce evidence of Mr. Pruitt's gang affiliation to impeach his character for truthfulness. Instead, the State sought to introduce the evidence to show bias pursuant to Rule 616. Rule 616, unlike Rules 404(b) and 608(b), does not require the trial court to hold a jury-out hearing regarding the evidence upon a party's request. Accordingly, we conclude that trial counsel was not ineffective in failing to request a jury-out hearing regarding Mr. Pruitt's gang affiliation. Furthermore, trial counsel testified at the postconviction hearing that he did not object more strenuously because he did not want to over emphasize the evidence and because he hoped that the jury would come to the conclusion that the murders were gang related. We agree with the post-conviction court that these "tactics seem reasoned trial strategy, which this court will not second-guess on postconviction."

*Brooks*, 2012 WL 112554, at *13–*14.

It is apparent that the Tennessee court applied the appropriate standard, as articulated in *Strickland v. Washington*, which required consideration of whether counsel's performance was deficient and, if so, whether the deficiency was prejudicial. The court reasonably concluded, using that standard, that the petitioner's trial counsel was not ineffective. The state court's resolution of the claim was not contrary to clearly established federal law, nor did it involve an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The petitioner is therefore not entitled to relief on the basis of this claim.

To the extent the petitioner's reference to "selective and vindictive prosecution" was intended to address some other issue, any such claim is defaulted and barred from review. In addressing this same question, the state appellate court stated:

> The Petitioner contends that he received ineffective assistance of trial counsel by trial counsel's failure to object "to the selective and vindictive prosecution by the State." However, in his brief, the Petitioner failed to include any argument on this issue, cite to any evidence that the State engaged in "selective and vindictive prosecution," make any citations to authorities on the issue, or make any appropriate references to the record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also State v. Sanders*, 842 S.W.2d 257, 260–61 (Tenn. Crim. App. 1992). Accordingly, we conclude that the Petitioner has waived this issue.

*Brooks v. State*, 2012 WL 112554, at *15.

In other words, the Tennessee appellate court applied a state procedural rule, and concluded that review of the claim was barred on the basis of that rule. "[I]f the state court decides the petitioner's claims on an adequate and independent state ground, such as a procedural rule, the petitioner's claims are considered procedurally defaulted and he is barred from seeking federal habeas review." *Cone v. Bell*, 492 F.3d 743, 758 (6th Cir. 2007) (denying federal habeas on a claim deemed waived by the state appellate court) (citing *Wainwright v. Sykes*, 433 U.S. 72, 86–87 (1977)); s*ee also Dykes v. Morrow*, No. 1:08-CV-110, 2009 U.S. Dist. LEXIS 24582, at *11–*15 (E.D. Tenn. Mar. 26, 2009) (denying federal habeas relief on a claim deemed waived by the state appellate court as a result of the petitioner's failure to support the claim with adequate argument pursuant to state procedural rules).

The Court concludes that federal habeas review of this claim is barred; the claim is therefore subject to dismissal.

### (iv) Counsel's failure to challenge the standard used by the trial court in denying the petition for writ of error coram nobis

The petitioner claims that the *coram nobis* court used an improper standard of review to deny his claim, and that his counsel's failure to raise the alleged error on direct appeal constituted ineffective assistance of counsel. (ECF No. 2, at 43.) The Tennessee Court of Criminal Appeals affirmed the denial of relief on this issue on the basis that, because an error *coram nobis* proceeding is a collateral review of a conviction, and because there is no constitutional right to counsel in an error *coram nobis* proceeding, "there can be no claim for ineffective assistance of counsel arising from the proceeding." *Brooks*, 2012 WL 112554, at *18 (citing *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)).

The petitioner has not shown that he is entitled to relief on the basis of this claim. Under Tennessee law, a *coram nobis* action is considered a collateral-review proceeding. *Brooks v. State*, 2012 WL 112554, at *10; Tenn. Code Ann. § 40-26-105. Under state law, the decision whether to appoint counsel in a *coram nobis* proceeding, as in a habeas proceeding, is left to the discretion of the court having jurisdiction. Tenn. Code Ann. § 40-14-204. The Supreme Court has consistently held that, under federal law, there is "no constitutional right to an attorney in state post-conviction proceedings"; consequently, "a [federal habeas] petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991); *see also Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further."). The fact that the appeal of the denial of the petitioner's petition for the writ of error *coram nobis* was consolidated with his direct appeal does not allow him to avoid the import of these decisions. Moreover, a claim based on ineffective assistance of counsel during state post-conviction proceedings is also barred by statute: "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i), *cited in Brooks v. Bobby*, 660 F.3d 959, (6th Cir. 2011).

It is therefore clear that the state court's adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law, and it did not involve an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d). Even if that were not the case, as noted above, the state court also concluded that the trial court did not apply an incorrect standard under state law in denying the petitioner's application for a writ of error *coram nobis*. Logically, the petitioner cannot show either that his trial counsel was ineffective for failing to raise the issue or that the petitioner was prejudiced by the alleged failure.

The petitioner is not entitled to relief on the basis of this claim.

## IV.   CONCLUSION

This case is somewhat troubling precisely because the State's evidence was scant and contradictory, and the petitioner's trial counsel clearly did not do all he could have done to call the State's marginal evidence into question. The fact that a young man was given an effective sentence of 104 years

on such slim evidence is further cause of concern. Notwithstanding, it is not this Court's prerogative to review the evidence, or to second-guess the state courts' decisions. Rather, this Court must simply consider whether the state court's adjudication of the petitioner's claims was contrary to, or involved an unreasonable application of, clearly established federal law, or if it involved an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d). Under this standard, the petitioner has not established that he is entitled to relief on the basis of any of his claims. The petition must therefore be denied.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citations omitted). "[A] COA does not require a showing that the appeal will succeed." *Id.* at 337. Courts should not issue a COA as a matter of course. *Id.*

In light of these principles, the Court will grant a COA as to three of the petitioner's claims: (1) his challenge to his conviction based on the insufficiency of the evidence; (2) his claim of ineffective assistance of counsel based on his trial counsel's failure to investigate potential witnesses James Taylor and Jimmy Carr and failure to call these witnesses to testify; and (3) the claim of ineffective assistance of counsel based on trial counsel's failure to object during the prosecutor's closing argument.

An appropriate order will enter.

Kevin H. Sharp
United States District Judge